**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ILENE P. KING,

        Plaintiff,

    v.

CIGNA CORPORATION; CONNECTICUT
GENERAL LIFE INSURANCE COMPANY; and
ALLTEL TELEPHONE SERVICES LONG TERM
DISABILITY PLAN,

        Defendants.

_____/

No. C 06-7025 CW

ORDER GRANTING IN
PART PLAINTIFF'S
MOTION FOR JUDGMENT,
GRANTING IN PART
DEFENDANTS CGLIC'S
AND ALLTEL PLAN'S
CROSS-MOTION FOR
JUDGMENT AND
GRANTING DEFENDANT
CIGNA'S CROSS-MOTION
FOR JUDGMENT

    Plaintiff Ilene P. King filed this lawsuit against Cigna
Corporation, Connecticut General Life Insurance Company (CGLIC) and
Alltel Telephone Services Long Term Disability Plan (the Plan or
Alltel Plan), after CGLIC terminated her long-term disability
benefits.  Plaintiff now moves, pursuant to Federal Rule of Civil
Procedure 52, for judgment.  Defendants oppose the motion, and
cross-move for judgment in their favor.  The matter was heard on
July 26, 2007.  Having considered all of the papers filed by the
parties, the evidence cited therein and oral argument, the Court
grants the motions in part and denies them in part.

BACKGROUND

Plaintiff worked at C.P. National Corporation, which was later acquired by Alltel Telephone Services, as a senior programmer analyst from 1982 to 1986.[1]  CGLIC 1008.[2]  The position was largely sedentary, requiring sitting approximately seventy percent of the time, bending approximately fifteen percent of the time, walking approximately ten percent of the time and standing approximately five percent of the time.  CGLIC 1023.  According to Plaintiff, while working as a senior programmer analyst, she was working fourteen to sixteen hour days and began having muscle spasms. Report of Dr. Robert Hines, p. 2.

In December, 1985, Plaintiff's back went out completely; she had bent over and was then unable to straighten her back.  Id.; CGLIC 934.  She spent a week on bed rest and then returned to work.  CGLIC 934.  Despite physical therapy, Plaintiff's pain increased.  Id.  She was diagnosed with herniated discs at L4-5 and L5-S1 with radiculitis and radiculopathy into the lower right leg. Dr. William E. Mathews determined that Plaintiff should undergo a L4-5, L5-S1 diskectomy.  CGLIC 960.

Plaintiff's last day of work was July 10, 1986.  CGLIC 1023. The next day she had a diskectomy, her first of three back surgeries.  Hines Report, pp. 2-3.  She attempted to return to work

---

[1]Prior to her work as a senior programmer analyst, Plaintiff worked as a programmer analyst, a computer operator and a key punch operator.  CGLIC 1008.

[2]References to "CGLIC ___" are to the bates-stamped administrative record Defendants provide.  Plaintiff provides her own copy of the administrative record, which is marked as "IK ___."

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

in December, 1986, but, after working one day, she could not return.  <u>Id.</u>

In January, 1987, CGLIC began paying disability benefits to Plaintiff under a policy that it had issued.  The policy did not designate a plan administrator.  Cigna, an indirect parent corporation of CGLIC, did not issue the policy, nor did it have any role in the processing of Plaintiff's claims for long-term disability benefits.  The policy provides a gross monthly benefit of sixty-six and two-third percent of an employee's monthly salary.  CGLIC 14.  Under the policy, if the disability prevents the employee from performing the duties of his or her occupation, the monthly benefit will be paid for twenty-four months.  After twenty-four months passes, however, an employee is entitled to a monthly benefit only if the employee is so disabled that he or she is completely prevented from engaging in any occupation or employment for which he or she is qualified, or may reasonably become qualified, based on his or her training, education or experience.  CGLIC 20.

According to a letter Dr. Mathews wrote in July, 1987, even after the first surgery, Plaintiff had continued complaints of low back pain; the pain intensified with prolonged sitting or bending.  CGLIC 933.  Dr. Mathews concluded that Plaintiff was suffering from recurrent lumbar disc displacement and that a second surgery would be necessary.  <u>Id.</u>  The second lumbar surgery occurred in August, 1987.  Hines Report, p. 3.  Dr. Mathews estimated that the disability time following this type of surgery would be approximately six to nine months.  CGLIC 933.

United States District Court
For the Northern District of California

1    Plaintiff's pain continued after the second surgery.  Any

2  activity, especially sitting, walking or standing, increased her

3  pain.  CGLIC 920.  Plaintiff was given Colchicine IV injections and

4  epidural injunctions with morphine and Demerol, but the pain

5  continued.  Hines Report, p. 3.  In September, 1988, Plaintiff

6  underwent a third surgery.  Id.  It did not alleviate her back pain

7  and she was sent home from the surgery with her first prescription

8  for a walker.  Id.

9    In April, 1989, Dr. William Haddock evaluated Plaintiff for

10  structural abnormality, noting that she had "severe low back pain

11  radiating into left leg."  CGLIC 879.  The images of Plaintiff's

12  lumbar spine, however, showed post-operative changes but no other

13  significant findings.  Id.

14    A few months later, Dr. Charles Barnes performed a lumbar

15  diskogram, with the hopes of reducing Plaintiff's pain: it was not

16  successful.  CGLIC 876.  In September, 1989, Dr. Barnes sent a

17  letter to CGLIC, informing it that Plaintiff remained disabled and

18  that she may have to undergo yet another surgery.  CGLIC 873.

19    An evaluation form Dr. Barnes filled out in 1993 stated that

20  Plaintiff's subjective symptoms were low back pain, neck pain,

21  headaches and spasms in her back with severe leg pain; the

22  objective findings were minor degeneration and disc protrusion at

23  C5-6 level and C4-5 minor protrusion.  CGLIC 843.  Dr. Barnes

24  concluded that Plaintiff's prognosis had not changed and that she

25  was limited in her ability to stand, climb, walk, stoop, lift and

26  sit.  CGLIC 843-44.  He further concluded that Plaintiff was

27  totally disabled from her occupation and any other occupation and

28                                4

was not a suitable candidate for further rehabilitative services. CGLIC 844.  He marked the box "Indefinite" as to when he thought Plaintiff would be able to resume any work.  Id.

In 1994, Dr. Barnes retired.  He referred Plaintiff to Dr. Tim Howard, who, according to Plaintiff, found her problems so overwhelming and complex that he felt he had nothing surgically to offer.  Hines Report, p.4.  Plaintiff also saw a sports orthopedist, Dr. Torsten Jacobsen, who concluded that Plaintiff was "psychologically and physically significantly handicapped as a result of her spinal history." Id.; CGLIC 818-20.  But, after Dr. Barnes's retirement, Plaintiff did not see another orthopedist on a regular basis.  See id.

In 1995, Dr. Carl Ahroon, an internist, completed Plaintiff's evaluation form.  This evaluation was largely identical to the one Dr. Barnes filled out in 1993.  Dr. Ahroon retired in 2000 and Dr. Vivek Jain took over Dr. Ahroon's practice and Plaintiff's primary care.  Like Dr. Ahroon, Dr. Jain specialized in internal medicine.

In March, 2001, Dr. Jain referred Plaintiff to a pain specialist, Dr. Kasra Amirdelfan, who evaluated Plaintiff.  Dr. Amirdelfan noted that Plaintiff "ambulated with a walker and walks quite slowly" and that she "has frequent episodes of grimacing, moaning and response gestures more customary for acute pain than chronic pain." CGLIC 660.  He also noted that Plaintiff stated that she had been using a walker for approximately twenty years. CGLIC 661.  His assessment was that Plaintiff suffered from post-laminectomy syndrome, depression and severe decompensation.  Id.

5

**United States District Court**
For the Northern District of California

He recommended that Plaintiff increase her dosage of morphine and Celebrex, an anti-depressant, and that she seek psychological support.  CGLIC 661-62.

Dr. Amirdelfan again saw Plaintiff in July, 2001.  Plaintiff reported that the pain was approximately the same and that she had not sought any psychological evaluation or support, as he had recommended.  He again recommended that Plaintiff increase her dose of morphine.  CGLIC 657.

In August, 2002, Plaintiff filled out a disability questionnaire and activities of daily living form.  She stated that she cannot remain in any position for any period of time without increased pain spasms shooting through her spine: "sitting is worse, followed by walking."  CGLIC 762.  She listed her condition that prevented her from working as "degenerative disc disease in lumbar and cervical areas."  Id.  She stated that she used a walker and wheelchair if she had to "walk distances," and that she could drive, but not on freeways and approximately only five miles.  She was, however, able to do a bit of cooking, cleaning and shopping.  Id.  But she was unable to exercise or to go for walks because the longer she is on her feet the more intense the spasms and pain becomes.  CGLIC 763.

A couple of months later, Dr. Jain responded to CGLIC's request for information.  He listed Plaintiff's primary diagnosis as cervical lumbar disc disease and her secondary diagnosis as chronic obstructive pulmonary disease and asthma.  CGLIC 697.  Included among Plaintiff's subjective complaints were muscle spasms, leg weakness, inability to sit, to stand or to walk for

6

prolonged periods, depression, back pain, numbness/tingling and buttock and thigh pain.  Id.  Dr. Jain's current clinical findings were limited range of motion, paraspinal muscle spasm, splinting behavior, motor weakness and antalgic gait.  CGLIC 698.  Under current level of funationality, he wrote, "Unable to do any type of work due to her symptoms."  Id.

In the beginning of 2003, CGLIC began to question whether Plaintiff was totally disabled and, thus, entitled to long-term benefits.  At a staffing session in February, 2003, CGLIC's medical director and a nurse case manager determined that the medical information in the file did not support a total disability finding. CGLIC 265.  They further determined that, "to accurately assess current functionality," Plaintiff should have a Functional Capacity Evaluation (FCE) and recommended surveillance to observe Plaintiff's daily activities.

On April 8, 2003, Plaintiff had a FCE.  The evaluation noted that Plaintiff was "only able to do sitting once, but with great difficulty due to pain in her low back.  She sat only for five minutes due to her back pain."  CGLIC 631.  For the majority of the evaluation, Plaintiff stood with her walker and often had her back leaning against a wall.  Id.  At the evaluation, Plaintiff reported that she could generally only sit for ten minutes, stand for twenty minutes, walk for five minutes, drive for ten miles and lift ten pounds.  CGLIC 633.  On a scale of one to ten, her pain ranged from four at best to ten at its worst.  Sitting, turning in bed, reaching, lifting, bending, stooping and walking up an incline aggravated Plaintiff's back and neck; ice, heat, lying supine and

7

leaning against a wall provided relief.  <u>Id.</u>

The physical therapist conducting the evaluation concluded:

The results of this evaluation indicated that Ilene King was minimally able to participate in the Functional Capacity Evaluation.  Ms. King demonstrated self-limiting behavior. She was only able to complete the subjective and limited musculosketal screening parts of the evaluation due to her very limited tolerance.  She also demonstrated pain behaviors and was very emotionally labile, as shown by frequent grimacing, moaning and tearfulness.  Her speech was slow and deliberate, with frequent pauses accompanied by facial grimacing.  During small body movements and transfers from one position to another, Ms. King demonstrated facial expressions with crying that suggest an acute shooting or stabbing pain.

CGLIC 630.  Nonetheless, the therapist found that Plaintiff could occasionally sit and walk and could frequently stand.  CGLIC 635.

That same day and the next day, CGLIC had surveillance of Plaintiff conducted.  She was videotaped on April 8, 2003, as she arrived at her evaluation, using the assistance of a walker for orthopedic support.  CGLIC 596.  She was also videotaped as she left her evaluation.  Her husband had picked her up and then they went out to eat.  CGLIC 597.

On April 9, 2003, Plaintiff was seen leaving her home and driving to various locations, including Kinko's, the credit union, a medical building, a liquor store and a grocery store.  CGLIC 598-601.  She would get her walker out of the car, use it to walk where she was going, and then put it back in the car.  At least once she was seen struggling, trying to get the walker back into the car. CGLIC 599.  When she was at the grocery store, however, she did not use her walker; rather she used a shopping cart for support.  GCLIC 600.

United States District Court
For the Northern District of California

8

United States District Court
For the Northern District of California

Later that month, CGLIC's medical director watched the surveillance video. He concluded that there were inconsistencies in what she was able to do at the FCE, her reported activities of daily living and what was captured on the video. CGLIC 264. But he did note that, when Plaintiff dropped her keys on the ground, she picked them up with her right foot instead of bending over which would have put pressure on the S1 nerve and caused pain. Id. The medical director recommended doing additional surveillance.

Surveillance was conducted on May 22 and 23, 2003. CGLIC 580-589. Crawford Investigation Services provided the following summary:

> An investigation was conducted for a period of two consecutive days and approximately 17 minutes and 26 seconds of videotape were obtained of the Subject. During the investigation, the Subject traveled to Long's Drugstore, an unidentified medical facility, and Burlington Coat Factory. The Investigator was successful in obtaining videotape of the Subject as she walked at a slow place while utilizing an orthopedic walker; as she walked at a quick pace; as she raised her right hand over head; as she walked with an apparent limp; as she apparently tried on shoes while lifting her right foot partially into the air and bending at the waist; and as she reached within a vehicle trunk while bending at the waist.

CGLIC 582. On May 22, 2003, the investigator observed Plaintiff going to a doctor's appointment and Long's Drugstore. Although Plaintiff used her walker for her doctor's appointment, she did not use it at Long's Drugstore; instead, she pushed around a shopping cart. On May 23, 2003, Plaintiff was seen entering the Burlington Coat Factory. She did not use her walker. Although she walked with a limp, the investigator stated that she entered the store at a quick pace. Approximately ninety minutes later, the investigator videotaped Plaintiff leaving the store carrying large white plastic

bags, which she then loaded into her car trunk.

These surveillance videos were also reviewed by one of CGLIC's medical directors, who concluded that the observations in the videos failed to support the restrictions and limitations provided by Dr. Jain.  The medical director instructed that more surveillance should be conducted.  CGLIC 572.

Two more days of surveillance were conducted on August 20 and 21, 2003.  CGLIC 550-559.  On August 20, 2003, Plaintiff's parent picked her up from her home, taking her to lunch and assisting her with grocery shopping.  CGLIC 552-54.  Although the investigator was not able to videotape it, he observed Plaintiff on two separate occasions sitting at a table in the restaurant.  It is not clear how long she sat at the table.  CGLIC 552-53.  She was away from home approximately two and a half hours that day.  The next day, Plaintiff was away from her home from approximately 1:00 p.m. to 4:00 p.m.  CGLIC 555-559.  She went to the liquor store, the gas station and three different grocery stores.  She used her walker when she went into the liquor store, but at the grocery stores she used "the shopping cart to steady herself."  CGLIC 556.

In September, 2003, Plaintiff had an MRI.  CGLIC 346.  The impression from the MRI was "multi-level degenerative disk disease most notable for mild left-sided C5-6 foraminal stenosis."  Id.

In December, 2003, one of CGLIC's medical directors reviewed the August surveillance.  He noted that Plaintiff presented "variable pictures" ranging from "walker dependance" when with her family to "independent ambulation without an assistive device while carrying small bags."  CGLIC 548.  He concluded that Plaintiff's

FCE "was clearly not representative of the claimant's known capacity from various surveillance observations."  CGLIC 548. Although he acknowledged that Plaintiff "limits spinal flexion" and is slow with "vehicular ingress and egress," he determined that "she appears functional for sedentary activity given limited walking and ability to change positions from sitting as needed." CGLIC 548.

Nonetheless, CGLIC continued to pay disability benefits to Plaintiff as before and Plaintiff and Dr. Jain continued to provide CGLIC with the required paperwork.  For example, on January 19, 2005, Dr. Jain submitted an attending physician statement, again concluding that Plaintiff was totally disabled from any occupation and that "she will not be able to resume work anytime."  CGLIC 525.

In 2005, Plaintiff also submitted an updated disability questionnaire and activities of daily living form.  CGLIC 519-20. As in previous questionnaires and forms, she stated that the reason she cannot work is because while sitting, standing or walking for any period of time her spinal pain and spasms intensify and that medication only takes the edge off; it does not relieve her pain. She also stated that "writing or other repetitive hand/arm movements cause pain/spasms/numbness in arms into fingers & into neck area with severe headaches."  CGLIC 519.  According to Plaintiff, she uses a walker regularly and is able to walk a few blocks as long as she stops frequently.  If she has to go any distance, she needs a wheelchair.  She can cook, clean, shop, garden, read and watch television, but she does not do all these things daily.  Sometimes she will go weeks without cooking; other

times she can cook but only for small periods at time.  CGLIC 519.
Plaintiff listed Dr. Jain and Dr. Clark Tsai, an eye doctor, as
doctors she sees regularly.  Plaintiff explained that, after Dr.
Barnes retired, she was unable to find another orthopedic
specialist willing to treat her and that Dr. Jain monitors her
spinal problems and prescribes medication.

Shortly after Plaintiff filed out this disability
questionnaire, CGLIC requested that Dr. Jain complete a Physical
Ability Assessment.  CGLIC 456.  Dr. Jain reported that, throughout
an eight-hour work day, with positional changes and meal breaks,
Plaintiff can sit occasionally, less than 2.5 hours, can stand
occasionally, less than 2.5 hours, and can walk occasionally, less
than 2.5 hours.  CGLIC 457.

In August, 2005, CGLIC concluded that, although Plaintiff's
physician stated that she is unable to perform any occupation for a
forty-hours-a-week period, Plaintiff was more active on
surveillance and her disability questionnaire than the medical
limitations provided by her doctor.  This qualified as a "Red Flag
Indicator."  CGLIC 259.  More surveillance and a peer review report
were recommended.

Two more days of surveillance were conducted on October 17 and
18, 2005.  CGLIC 446-452.  On the first day of surveillance, the
investigator observed Plaintiff leaving her home at 2:40 p.m. and
driving to a nearby mall, a liquor store and a law office before
returning home less than two hours later.  She used her walker,
which she retrieved from the trunk of her car, occasionally bending
at the knee as she folded it back up and put it back in the truck.

Although the investigator determined that Plaintiff was home on October 18, 2005, no activity was observed.  CGLIC concluded that these two days of surveillance suggested "a functional level of at least sedentary capacity."  CGLIC 224.

CGLIC requested that Dr. Dan Gerstenblitt, who specializes in occupational medicine, conduct a peer review.  On January 31, 2006, Dr. Gerstenblitt prepared his report, which acknowledged that he had not examined Plaintiff.  CGLIC 401.  Based on his review of the medical records and surveillance videos, he concluded:

> The claimant is felt to be able to work full time sedentary work . . . . The claim is being driven by the self reports and self-imposed limitation of activity by the claimant.  There was no documentation of objective evidence for radiculopathy in this case.  The claimant's pain complaints are out of proportion to the relatively innocuous appearing MRI and other diagnostic studies. . . . The surveillance clearly shows the claimant driving, going grocery shopping and able to go to other stores.  She was able to walk without a walker if she chose so.  Additionally, the claimant apparently was walking with a walker for 25 years, so presumably she can work with the use of a walker in a sedentary job.  The surveillance activity clearly supports that the claimant can perform in at least a sedentary job capacity. . . . In summary, the claimant used a walker prior to the lumbar surgeries and going out of work, and, frankly, there was no reason she could not return to work at some point in time after the lumbar surgeries.  The available information indicated that the claimant was capable of working in at least a sedentary job with the only thing stopping the claimant from doing so being her self-limiting activities and subjective complaints.

CGLIC 403.

CGLIC received Dr. Gerstenblitt's report on February 2, 2006.  IK 50.  Five days later an entry was created in CGLIC's internal claim file: "f/u with VRC for formal TSA--forward denial letter and inform cx of determination."  IK 16.  The next day, seemingly after CGLIC decided to terminate Plaintiff's long-term disability benefits, CGLIC requested a transferable skills analysis (TSA) to

determine Plaintiff's transferable work skills and residual

functional capacities and to determine whether relevant occupations

existed at or above the wage requirements.  CGLIC 415.  According

to the TSA, which was completed later that day, there were four

suitable occupations for Plaintiff: check writer; appointment

clerk; charge-account clerk; and dispatcher, maintenance service.

Id.

On February 10, 2006, Cigna Group Insurance[3], representing

CGLIC, the underwriting company, sent Plaintiff a letter advising

her that CGLIC had determined that she was able to engage in a

sedentary occupation for which she was qualified or which she may

reasonably become qualified by education, training or experience;

therefore, as of February 8, 2007, her long-term disability

benefits were terminated.  CGLIC 177-81.  To "prevent financial

hardship," however, CGLIC would continue to pay her through

March 6, 2006.  CGLIC 180.  The letter informed Plaintiff that she

could appeal the denial of her claim and that her appeal "should be

in writing" and should "state the reasons why you feel your claims

should not have been denied."  Id.  Her appeal was to be addressed

to CGLIC's representative, Cigna Disability Management Solutions.

Id.

On March 7, 2006, Plaintiff's counsel wrote to Cigna Group

Insurance, Cigna Disability Management Solutions and the Plan,

informing them that Plaintiff wished to appeal the termination of

[3]Cigna Group Insurance is a registered service mark and refers
to various operating subsidiaries of Cigna Corporation.  Cigna
Corporation's subsidiaries provide products and services; Cigna
Corporation does not.  CGLIC is one of these subsidiaries.  IK 1.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

her benefits and requesting the documents and information necessary
for her to do so.  IK 46-7.  Her counsel asked that Plaintiff be
informed "of any particular additional medical information or
records which you consider necessary to perfect Ms. King's claim
for benefits."  IK 47.

Later that month, Cigna Group Insurance, again representing
the underwriter CGLIC, purported to provide Plaintiff "with a copy
of the information requested" in the March 7, 2007 letter.  IR 1.
According to Plaintiff, however, all the information she requested
was not provided.  She did not receive copies of the Summary Plan
Description or claim manuals.  In addition, there was no response
to her request to explain what was needed to perfect her claim.

On August 8, 2006, Plaintiff's counsel sent a letter
requesting the omitted information.  CGLIC 376-9.  Three days
later, Cigna Group Insurance, on behalf of CGLIC, responded, "As
noted in our letter of February 10, 2006, we will consider any
additional relevant information which supports your Disability.
However, it is your responsibility to provide this information to
us by September 1, 2006 or our decision may be based on the
available information."  CGLIC 174.  It provided no further
information.

Plaintiff's counsel arranged for Plaintiff to be examined by
Dr. Robert Hines, who is certified by the American Board of
Psychiatry and Neurology and the American Board of Pain Medicine.
Hines Report, p. 12.  Plaintiff met with Dr. Hines for three and a
half hours.  In addition, he reviewed her medical records, the
surveillance videos, Dr. Gerstenblitt's report, the FCE, an

15

United States District Court
For the Northern District of California

administrative law judge's decision granting Plaintiff Social

Security Disability, and other correspondence and evaluations.

Hines Report, pp. 1-2.  His conclusion was as follows:

> This 53-year-old woman presents with a severe chronic pain
> disorder secondary to multi-level painful degenerative disc
> disease and failed lumbar surgery.  In reviewing the patient's
> medical records, presentation today, video surveillance, and
> past evaluations by neurosurgeons and orthopedists, it is
> clear that she is disabled.
>
> One of the striking features of the patient's longitudinal
> course is the absence of neurosurgical or orthopedic follow
> up.  That is, the last note authored by Dr. Barnes, the
> surgeon performing the lumbar fusion, suggests the patient's
> fusion is not solid at L5-S1 nor at L3-4.  This was
> substantiated by the CT examination at that time which is the
> best way to evaluate such. . . .
>
> Indeed, this patient's overwhelming pain and disability have
> appeared to be consistent throughout the patient's records as
> well as sub rosa taping. In my experience with many thousands
> of failed back surgery patients, the dismissing as overly
> complex of a patient's symptoms is an all too common feature.
> The postural flexion bias which the patient clearly prefers
> . . . and the repeated observation of investigators that the
> patient prefers either her walker or a push cart in stores is
> also consistent with the patient's severe lumbar pathology and
> failed lumbar fusion. . . .
>
> It is my strong opinion, based on the finding and review of
> records, including the sub rosa observations, that Ms. King is
> unable to perform the duties of any full-time occupation.
> While I philosophically feel that all patients, even those
> with severe pain disorders such as Ms. King, would benefit
> from a positive focus in their life, it is unreasonable to
> expect that she would be competitive in the open labor market,
> and any job would have to be done in an extraordinarily
> modified, part-time way . . . .
>
> At this juncture, I do not feel that the patient's medications
> greatly affect her ability to perform in the work place . . . .
> It is conceivable that if she were aggressively treated with
> medications, she might be somewhat more functional, but it is
> not medically probably that she would be functional enough to
> be employed. . . .
>
> In reviewing this patient's condition, course, and medical
> records, as well as presentation today, I find her symptoms to
> be both reasonably reliable and credible. . . . I am frankly
> at a loss to completely understand Dr. Gerstenblitt's opinion.

United States District Court
For the Northern District of California

It would appear that, without a good faith examination and without adequate training or knowledge of pain medicine and orthopedics, he has rendered a highly subjective and injurious report regarding Ms. King.

One of the most striking features of his report and that which he makes a great deal of -- and, subsequently, the insurance company makes a great deal of -- is his statement that "What is significant about this note [from Dr. Amirdelfan] is that the claimant has been using a walker since the age of 27!"  He goes on in his conclusion of his report to state, "In summary, the claimant used a walker prior to the lumbar surgeries and going out of work, and frankly, there was no reason she could not return to work at some point in time after the lumbar surgeries."  As noted in the body of my report, this is simply an error.  The patient began using a walker after her three-level lumbar fusion and continues to use such to this date.  This use is consistent with her lumbar pathology and failed lumbar fusion and post-laminectomy syndrome. . . . On the whole, I find Dr. Gerstenblitt's evaluation to be extremely inadequate. . . .

I find the videotape surveillance showing the patient using a walker and ambulating with an antalgic gait when not using a walker to be quite consistent with the finding and medical history.  Indeed, the fact that she does put the walker into the trunk herself is not inconsistent.  The patient uses others to put the walker in the trunk when they are available and such activity, while not ideal and aggravating to her pain, can be done but with likely sequelae of flares of pain.  Whether the patient, out of necessity, can occasionally do activities that might be routine in the work place seems to have little to do with whether she can sustain such activities.  Flares of pain are quite detrimental to one's focus and ability to perform cognitive tasks.

Hines Report, pp. 8-12.

On September 15, 2006, Plaintiff's counsel sent Dr. Hine's report and medical records from Dr. Jain to Cigna Group Insurance, serving as CGLIC's representative.  Attached with the report and records was a letter from Plaintiff's counsel stating that "the information CIGNA has should now be sufficient to uphold Mrs. King's appeal of CIGNA's decision.  If CIGNA disagrees, however, I respectfully request once again that you inform me promptly of any additional information or documentation that you believe is

17

necessary for Mrs. King to perfect her claim for continued insurance benefits." CGLIC 372.

On December 12, 2006, Cigna Group Insurance, representing CGLIC, sent a letter to Plaintiff's counsel, informing him that it had completed its review; it would uphold its prior decision to deny benefits. CGLIC 168. The letter explained,

> Ms. King's complete file, including any additional information you submitted, was reviewed in its entirety without deference to our prior reviews. Additional medical information we received consisted of medical documentation previously reviewed prior to our February 10, 2006 decision to deny benefits as well as Pain Management evaluation dated August 11, 2006. However, medical documentation has not been submitted to refute the peer review performed by Dr. Gerstenblitt. Therefore, the Transferable Skills Analysis remains valid.

CGLIC 168.

Plaintiff brought this action against Cigna Corporation, CGLIC and the Plan, seeking benefits due under ERISA. Plaintiff has alleged a second cause of action for breach of fiduciary duty and a third cause of action for statutory penalties, based on the purported failure to provide plan documents as required by ERISA. CGLIC explains that, because it issued the policy and is responsible for the payment of long-term benefits under the policy, it is providing a defense to the Plan with respect to Plaintiff's claims for long-term disability benefits and breach of fiduciary duty based on the handling of Plaintiff's claim. As discussed below, Cigna contends that it is an improper party in this action. It requested that Plaintiff voluntarily dismiss the claims against it. Plaintiff refused.

18

LEGAL STANDARD

ERISA provides Plaintiff with a federal cause of action to recover the benefits she claims are due under her policy. 29 U.S.C. § 1132(a)(1)(B). The standard of review of a plan administrator's denial of ERISA benefits depends upon the terms of the benefit plan. Absent contrary language in the plan, the denial is reviewed under a de novo standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). When reviewing de novo, a "court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (2006). However, if "the benefit plan expressly gives the plan administrator or fiduciary discre-tionary authority to determine eligibility for benefits or to construe the plan's terms," an abuse of discretion standard is applied. Firestone Tire, 489 U.S. at 115. Here, the parties agree that the Plan does not confer discretion and that this matter is subject to de novo review.

DISCUSSION

I. First cause of action for recovery of benefits

Defendants argue that CGLIC's decision to terminate Plaintiff's benefits must be upheld because Plaintiff's claim of total disability from any occupation is not supported by the record. Defendants do not challenge Plaintiff's medical diagnoses; rather, they contend that, notwithstanding her diagnoses, she is capable of doing sedentary work. As the Ninth Circuit instructs, "That a person has a true medical diagnosis does not by itself establish disability." Jordan v. Northrop Grumman Corp. Welfare

19

United States District Court
For the Northern District of California

Benefit Plan, 370 F.3d 869, 880 (9th Cir. 2004) (noting that "sometimes people are able to work despite their conditions; and sometimes people work to distract themselves from their conditions"). Defendants point out that it has been over a decade since Plaintiff was treated by an orthopedist.

That an orthopedist has not treated Plaintiff in many years weakens her claim. And her argument that Dr. Gerstenblitt's opinion should be disregarded because he is not a orthopedist, a neurologist or a pain management specialist fails. Nonetheless, the Court finds that Plaintiff has offered evidence to establish that she has a disabling medical condition. This evidence includes her own reports about the effect of her condition on her ability to function, the agreement of Dr. Hine that the symptoms that Plaintiff describes are consistent with those caused by her medical conditions, and her physicians' reports.

The only evidence that undermines Plaintiff's claim for benefits is Dr. Gerstenblitt's report. Dr. Gerstenblitt, however, concluded that Plaintiff was capable of working a sedentary job based only on her medical records and the surveillance videos. Had he examined Plaintiff, the Court might have found his opinion more persuasive. See Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) ("On de novo review, a district court may . . . take cognizance of the fact (if it is a fact in the particular case) that a given treating physician has a greater opportunity to know and observe the patient than a physician retained by the plan administrator.") (internal quotation marks omitted).

20

United States District Court
For the Northern District of California

1    Reviewing Plaintiff's medical records and watching the

2   surveillance videos, the Court did not reach the same conclusions

3   as Dr. Gerstenblitt.  That Plaintiff is able to bend to put her

4   walker in her car, to run errands or to stay at a restaurant for an

5   hour does not establish that she is able to work an eight-hour-a-

6   day job, especially one that requires her to spend most of her day

7   sitting.  Defendants provide no evidence showing otherwise.  As Dr.

8   Hine concluded, "Whether the patient, out of necessity, can

9   occasionally do activities that might be routine in the work place

10  seems to have little to do with whether she can sustain such

11  activities.  Flares of pain are quite detrimental to one's focus

12  and ability to perform cognitive tasks."  Hine Report, p. 12.

13  Therefore, after reviewing all of the evidence in the

14  administrative record, the Court concludes that Plaintiff has

15  established that she is entitled to an award of benefits.  Further,

16  these benefits are to continue until such time as her entitlement

17  to such benefits shall change or terminate pursuant to the terms of

18  the long term disability plan.

19    Although Plaintiff is entitled to benefits, she is not

20  entitled to those benefits from Defendant Cigna, which is not the

21  plan, the plan sponsor, a plan fiduciary, or the plan

22  administrator.  Nor did Defendant Cigna issue the policy,

23  administer Plaintiff's claim under the policy or participate in the

24  denial of Plaintiff's benefits.  See Everhart v. Allmerica

25  Financial Life Ins. Co., 275 F.3d 751, 753-54 (9th Cir. 2001)

26  (holding that the plaintiff could sue the plan and plan

27  administrator for ERISA plan benefits, but not the plan insurer).

28

1    Plaintiff's reliance on Seagate US LLC v. Cigna Corp., 2006

2  U.S. Dist. LEXIS 26776 (N.D. Cal. 2006) is misplaced.  In Seagate,

3  the court denied Cigna's motion to dismiss because the plaintiff

4  had alleged that Cigna appeared on the face of the policies.  This

5  case, however, is past the pleading stage and Plaintiff provides no

6  evidence to establish that Defendant Cigna is legally responsible

7  for paying the benefits which Plaintiff seeks in this action.

8  Nonetheless, the Court's ruling is based on counsel's

9  representation at the hearing that CGLIC is responsible for the

10  judgment awarded to Plaintiff as well as any attorneys' fees and

11  costs awarded.

12  II.  Second cause of action for breach of fiduciary duty

13    Defendants argue that Plaintiff's claim for breach of

14  fiduciary duty fails because it is premised solely on the purported

15  mishandling of her benefits claim.  The Ninth Circuit instructs

16  that a "'fiduciary's mishandling of an individual benefit claim

17  does not violate any of the fiduciary duties defined in ERISA.'"

18  Ford v. MCI Communications Corp. Health and Welfare Plan, 399 F.3d

19  1076, 1082 (9th Cir. 2005) (quoting Amalgamated Clothing & Textile

20  Workers Union, AFL-CIO v. Murdock, 861 F.2d 1406, 1414 (9th Cir.

21  1988)).  In addition, Defendant Cigna argues that Plaintiff's claim

22  against it fails because it is not a fiduciary under ERISA with

23  respect to the Plan and, therefore, it owes Plaintiff no fiduciary

24  duties.

25    Plaintiff responds by pointing to this Court's recent decision

26  in Caplan v. CNA Short Term Disability Plan, 479 F. Supp. 2d 1108

27  (N.D. Cal. 2007).  Her reliance on Caplan, however, is also

28                                    22

misplaced.   In <u>Caplan</u>, the Court dismissed the plaintiff's claim
under 29 U.S.C. section 1332(a)(3)to the extent that it was
duplicative of the plaintiff's section 1132(a)(1)(B) claim.   But
the Court found that the "the equitable relief Plaintiff seeks
under section 1132(a)(3) . . . may be different than the relief
available under section 1132(a)(1)(B), and such relief might not be
available to Plaintiff under the section 1132(a)(1)(B) claim
alone."   479 F. Supp. 2d at 1112-13.   Therefore, the Court
determined that it would be "premature" to dismiss the plaintiff's
entire claim under section 1132(a)(3).

Here, however, the only issue is Plaintiff's claim for
disability benefits.   Indeed, her complaint alleges that
"Defendants breached their fiduciary duties under ERISA by failing
properly to investigate and administer plaintiff's claim for
disability benefits, by failing to provide a full and fair review
of plaintiff's appeal of the denial of her benefits, and by failing
to administer the Plan in accordance with the purposes of the Plan
and for the exclusive benefit of its beneficiaries."   Although
Plaintiff states that, if the Court rules in her favor, she will
seek equitable relief if CGLIC refuses to pay, any relief she seeks
would not be different than the relief available under section
1132(a)(1)(B).   Therefore, the Court finds that Plaintiff's breach
of fiduciary duty claim fails as a matter of law against all
Defendants.   In addition, the Court concludes that Plaintiff failed
to establish that Defendant Cigna was a fiduciary and, therefore,
the claim fails against Defendant Cigna for that reason as well.

III.   Third cause of action for statutory penalties

ERISA requires that, upon written request of any plan participant, the plan administrator "shall" furnish a copy of certain documents including the "latest updated summary," "plan description," or "other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4); see also Moran v. Aetna Life Ins. Co., 872 F.2d 296, 298 (9th Cir. 1989). Failure to provide such documents may result in daily fines, and recovery of costs and attorneys' fees under sections 1132(c) and (g). Moran, 872 F.2d at 298. Plaintiff contends that Defendants Cigna and CGLIC did not send her the required documents and, therefore, she asks that the Court impose statutory penalties against them.[4]

But, as Defendants Cigna and CGLIC point out, the Ninth Circuit has held that only the administrator, as defined by ERISA, can be sued for failing to provide plan documents. Id. at 299-300. Plaintiff's argument that the Ninth Circuit has not definitively decided the issue is unavailing, as is her reliance on Younkin v. Prudential Ins. Co., 2006 U.S. Dist. LEXIS 65345 (D. Mont.). As explained in Rodriguez v. Reliance Standard Ins. Co., 2004 U.S. Dist. LEXIS 18485, *6-7 (N.D. Cal.), "the Ninth Circuit has expressly held that only those entities designated by the statute as the administrator can be held liable as the administrator for failure to provide plan documents."

---

[4]Plaintiff originally brought her third cause of action against all three Defendants. On June 13, 2007, however, the Court signed Plaintiff's and Defendant Alltel Plan's stipulation, dismissing without prejudice Plaintiff's third cause of action against Alltel Plan.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   ERISA defines an administrator as "the person so designated by

2   the terms of the instrument under which the plan is operated" or

3   "if an administrator is not so designated, the plan sponsor."  29

4   U.S.C. § 1002(16)(A).  The "plan sponsor" is "the employer in the

5   case of an employee benefit plan established or maintained by a

6   single employer."  29 U.S.C. § 1002(16)(B)(i).  Plaintiff does not

7   provide evidence that either CGLIC or Cigna are named as

8   administrators under the plan, nor does she contend that either are

9   plan sponsors.  Therefore, they are not liable under ERISA for

10  failure to provide documents.  Moran, 872 F.2d 296; see also

11  Rodriquez, 2004 U.S. Dist. LEXIS 18485 (holding that "an entity

12  which only de facto operates as an administrator cannot be held

13  liable as the administrator" under ERISA for failure to provide

14  documents).  Therefore, Plaintiff's third cause of action fails as

15  a matter of law.

16                            CONCLUSION

17  For the foregoing reasons, Plaintiff's motion for judgment

18  (Docket No. 29) is GRANTED IN PART and DENIED IN PART; Defendants

19  CGLIC's and Alltel Plan's cross-motion for judgment (Docket No. 62)

20  is also GRANTED IN PART AND DENIED IN PART.  Defendant Cigna's

21  cross-motion for judgment (Docket No. 63) is GRANTED.  Plaintiff is

22  entitled to an award of benefits against CGLIC and the Plan, but

23  not against Cigna.  Her benefits shall be restored immediately and

24  Defendants CGLIC and the Plan are ordered to pay Plaintiff's

25  benefits until and unless new facts indicate that Plaintiff no

26  longer meets the definition of disability under the long-term

27  disability plan.  Plaintiff's benefits may be terminated, if

28                              25

appropriate in the future, only in accordance with the Plan. Plaintiff's second cause of action, however, fails as a matter of law against all Defendants. Plaintiff's third cause of action against Cigna and CGLIC also fails. Plaintiff shall recover her costs of action from Defendants CGLIC and Alltel Plan. Defendant Cigna shall bear its own costs.

As ordered at the hearing, the parties shall submit a proposed judgment. This shall be submitted one week from the date of this order. If they are unable to agree on the proposed judgment, each party shall submit a proposed judgment with no more than two pages of argument in support of that judgment. These shall be submitted two weeks from the date of this order. Judgment shall enter accordingly.

IT IS SO ORDERED.

8/7/07

Dated: _____

CLAUDIA WILKEN
United States District Judge